## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

SOUTH SPANISH TRAIL, LLC.,
a Florida limited liability corporation,

      Plaintiff,

v.                                  CASE NO. 9:21-cv-80728-DMM

GLOBENET CABOS SUBMARINOS
AMERICA, INC., a Delaware for-profit
corporation, CARIBBEAN CROSSINGS
LTD., INC., AND JOHN DOES 1-100,

      Defendants.
_____/

GLOBENET CABOS SUBMARINOS
AMERICA, INC. and CARIBBEAN
CROSSINGS LTD, INC.,

      Counter-Plaintiffs,

v.

SOUTH SPANISH TRAIL, LLC, and BOARD
OF TRUSTEES OF THE INTERNAL
IMPROVEMENT TRUST FUND OF THE
STATE OF FLORIDA,

      Counter/Third-Party Defendants.
_____/

SOUTH SPANISH TRAIL, LLC,

      Cross-Plaintiff,

v.

3

BOARD OF TRUSTEES OF THE
INTERNAL IMPROVEMENT TRUST
FUND OF THE STATE OF FLORIDA,
FLORIDA INLAND NAVIGATIONAL
DISTRICT, and UNITED STATES OF AMERICA,

     Cross-Defendants.

_____/

### CROSS-DEFENDANT BOARD OF TRUSTEES OF THE INTERNAL IMPROVEMENT TRUST FUND MOTION TO DISMISS CROSSCLAIMS OF SOUTH SPANISH TRAIL, LLC

Cross-Defendant Board of Trustees of the Internal Improvement Trust fund of the State of Florida (Board of Trustees), by and through undersigned counsel and pursuant to rules 8(a)(2), 12(b)(1), and 12(b)(6), Federal Rules of Civil Procedure, and rule 7.1, Rules of the Southern District, moves to dismiss the crossclaims of Plaintiff/Counter-Plaintiff South Spanish Trail, LLC (SST), and as grounds therefore would show:

1.    SST initially filed this action against Defendant/Third-Party Plaintiff Globenet Cabos Submarinos America, Inc. (Globenet) and John Does 1-100, case no. 50-2020-CA-002024, in the Circuit Court of the Fifteenth Judicial Circuit of Florida, in and for Palm Beach County. SST subsequently filed an amended complaint adding Caribbean Crossings, LTD, Inc. (Caribbean) as an additional party defendant. (Doc. 1, Ex. 1). SST's claims against Globenet, John Does 1-100, and Caribbean stem from the 2000-2003 installation of subterranean conduits by Globenet's predecessor in interest

4

under land which is submerged beneath the Intracoastal Waterway (ICW) in Palm Beach County. (Doc. 1, Ex. 1 ¶¶ 57, 61). SST claims to have purchased the submerged property in question on December 9, 2016 and March 29, 2017, at least 13 years *after* installation of the conduit.

2.     Globenet and Caribbean brought counterclaims against SST and third-party claims against the Trustees for declaratory relief on October 20, 2020 (Doc. 1, Ex. 2), seeking a declaration that the submerged lands in dispute are sovereign lands to which the Trustees hold title. Globenet's and Caribbean's third-party claims against the Trustees were motivated substantially, if not entirely, by SST's erroneous claim that only the Trustees have standing to claim that the submerged property in question is sovereign land. *See* SST's Answer, Affirmative Defenses and Crossclaim to First Amended Counter Claim. (Doc. 1, Ex. 3 p. 19, n. 1).

3.     SST filed counterclaims against the Trustees, the United States, and the Florida Inland Navigation District (FIND) for declaratory relief (Count I) and against the Trustees for slander of title (Count II) on March 18, 2021. (Doc. 1, Ex. 3). The United States removed this action to federal court following service of SST's counterclaims pursuant to 28 U.S.C. § 1442(a)(1). (Doc. 1).

4.     When initially brought into this case by the third-party claims of Globenet and Caribbean, the Trustees were unsure whether the submerged lands in dispute were sovereign lands to which Florida took title upon

5

becoming a state on March 3, 1845. Having initiated an investigation, the Trustees have determined that the submerged lands in question are in fact sovereign lands to which they hold title in trust for the residents of Florida pursuant to Article X, section 11 of the Florida Constitution.

5.      SST claims that a declaratory judgement pursuant to chapter 86, Florida Statutes, is necessary because "[i]f the Court were to rule that the [Board of Trustees] owns the Property, rather than SST, the federal easement over the Property for the construction and maintenance of the ICW would be invalid as the [Trustees] [have] not granted an easement over that Property to the U.S." (DE 1, Ex. 3 p. 17, ¶ 23). This asserted justification for a declaratory judgment is both factually and legally incorrect. Based upon this specious assertion, SST then argues that the United States and FIND are indispensable parties. SST's argument is without merit.

6.      Count I of SST's counterclaim requesting declaratory judgment against the Trustees, the United States, and FIND fails to state a cause of action and must be dismissed because:

a)      The United States holds ultimate authority to regulate navigation over the ICW due to its authority over interstate commerce and the nation's waters under the Commerce Clause of the United States Constitution. The United States therefore has authority to maintain the ICW over the disputed submerged lands whether they are sovereign or

6

privately held, and SST's offered justification for declaratory relief does not exist.

b)      The State of Florida, through legislative action, granted to the United States all rights necessary, in perpetuity, to construct and maintain the ICW. Consequently, SST's argument that the federal easement necessary for continued maintenance of the ICW would be invalidated if the submerged land at issue is determined to be sovereign is baseless.

c)      SST's claim for declaratory relief is a shotgun pleading which improperly combines multiple declarations against multiple Defendants in a single count.

7.      Count II of SST's counterclaim alleging slander of title against the Trustees must be dismissed because:

a)      SST acquired its alleged interest in the disputed submerged property at least 16 years after the installation of the conduit by Globenet's predecessor in interest and Caribbean's installation of its cables in the conduit. SST therefore acquired its alleged interest in the property with full knowledge of the presence of the conduit and cables and the easements granted by the Trustees for their installation.

b)      The two-year statute of limitations for slander of title expired before Plaintiff brought its claim.

c)      SST cannot show that the Trustees issued the 1886 deed at the root of its claimed title with the intent or the authority to convey sovereign submerged lands. Consequently, SST cannot demonstrate that it possesses the requisite strength of its own title required to state a claim for slander of title for which relief can be granted.

## MEMORANDUM OF LAW

### I.      Overview of Florida Law Concerning Sovereign Submerged Lands

Under the equal footing doctrine, Florida took title to all lands submerged under navigable waters up to the ordinary high-water line upon becoming a state on March 3, 1845. *See Martin v. Busch*, 93 Fla. 535, 112 So. 274, 285 (1927). "[N]avigable waters include lakes, rivers, bays, or harbors, and all waters capable of practical navigation for useful purposes, whether affected by tides or not, and whether the water is navigable or not in all its parts toward the outside lines or elsewhere, or whether the waters are navigable during the entire year or not." *Id*. "No patents or surveys were required to delineate the boundaries of such sovereignty lands…" *Coastal Petroleum v. American Cyanamid Co.*, 492 So.2d 339, 342 (Fla. 1986).

Florida took title to these sovereignty lands under a public trust to preserve and protect them. *Id.*; *Broward v. Marby*, 58 Fla. 826, 50 So. 826, 829 (1909). In *State v. Black River Phosphate Co.*, 32 Fla. 82, 13 So. 640 (1893) the

8

Florida Supreme Court stated "the navigable waters of the state and the soil beneath them…were the property of the people of the state in their united or sovereign capacity, and were held, not for the purpose of sale or conversion into other values, or reduction into several or individual ownership, but for the use and enjoyment of the same by all the people of the state…" *Id.* at 648. The Court went on to state that "abdication [of control over sovereignty lands] is not consistent with the exercise of that trust which requires the government of the state to preserve such waters for the use of the public." *Id.* at 645. The public trust doctrine has been incorporated into Article X, section 11 of the Florida Constitution, which mandates that sovereignty lands be "held by the state…in trust for all the people" and that "[s]ale of such lands may be authorized by law, but only when in the public interest." Art. X, § 11, Fla. Const. *See also,* Glenn J. MacGrady, *Florida's Sovereignty Lands: What Are They, Who Owns Them, and Where is the Boundary?,* 1 Fla. St. U.L. Rev. 596, 599 (1973).

In contrast to state sovereignty lands, "swamp and overflowed lands" and other uplands continued to belong to the federal government after Florida became a state. *Coastal Petroleum*, 492 So.2d at 342. However, in the 1850s the federal government conducted surveys and conveyed approximately 20 million acres of swamp and overflowed lands to the State of Florida via patents. *Id.* "It is important to recognize that Congress had no intent or power to convey

9

state sovereignty lands thorough such acts or patents and that land surveys conducted in connection with those conveyances of swamp and overflowed lands are not conclusive against the state as to the meandered boundaries of state sovereignty lands." *Id.,* citing to *Borax Consolidated v. City of Los Angeles*, 296 U.S. 10, 16-17 (1935).

Florida's sovereign submerged lands "cannot be conveyed without clear intent and authority, and conveyances , where authorized and intended, must retain public use of the waters." *Coastal Petroleum*, 492 So.2d at 343. The 1886 deed from the Trustees to Arthur T. Williams from which SST traces its claimed title does not contain an express conveyance of sovereign lands, and SST does not allege to the contrary. (DE 1, Ex. 1, ¶¶ 53a., 55a.). Nor does the absence of a reservation of sovereign submerged lands in the 1886 Williams deed vest title of sovereign lands in SST. "The fact that a deed of swamp and overflowed lands does not explicitly exempt sovereignty lands from the conveyance does not show that the Trustees intended to convey sovereignty lands encompassed within the swamp and overflowed lands being conveyed." *Id.* As the 1886 deed from the Trustees to Arthur T. Williams does not expressly convey sovereign submerged lands, SST has no claim to any such lands. "Further, because grantees of swamp and overflowed lands took with notice that such grants did not convey sovereignty lands, neither they nor their successors have any moral or legal claim to those lands." *Id.*

10

Even had the Trustees intended to convey sovereign lands to Arthur Williams in 1886, they lacked the legal authority to do so at that time. The Florida legislature did not grant the Trustees the authority to convey sovereign lands into private ownership until 1917, at the earliest. *See Pierce v. Warren*, 47 So.2d 857, 858 (Fla. 1950) ("The basic question for us to determine is whether the trustees attempted to convey 'sovereignty lands' which they could not have done before the enactment of Chapter 7304 , Acts of 1917…") Because there was no clear intent or authority on the part of the Trustees to convey sovereign submerged lands in the 1886 deed, no sovereign land was conveyed. SST cannot therefore claim to be the "title owner" of the sovereign lands contained within the submerged property at issue.

II.    **Count I of SST's Counterclaim Requesting Declaratory Judgment Must be Dismissed Pursuant to Rule 12(b)(c), Fed. R. Civ. P., for Failure to State a Claim Upon Which Relief can be Granted.**

A. **SST has failed to allege a bona fide, actual need for the requested declaration.**

Chapter 86, Florida Statutes, authorizes trial courts to render declaratory judgments on the existence or non-existence of any immunity, power, privilege, or right. *See* § 86.011, Fla. Stat. (2020). However, "[b]efore any proceeding for declaratory relief should be entertained it should be clearly made to appear that there is a bona fide, actual, present practical need for the declaration." *Marco Island Cable v. Comcast Cablevision*, 509 F.Supp.2d 1158,

11

1163 (M.D. Fla. 2007), quoting *May v. Holley*, 59 So.2d 636 (Fla. 1952). "[I]t is well settled that, Florida courts will not render, in the form of a declaratory judgment, what amounts to an advisory opinion at the instance of parties who show merely the possibility of legal injury on the basis of a hypothetical state of facts which have not arisen and are only contingent, uncertain, [and] rest in the future.'" *Apthorp v. Detzner*, 162 So.3d 236, 240 (Fla. 1st DCA 2015), quoting *Santa Rosa Cty v. Admin. Comm'n, Div. of Admin. Hearings*, 661 So.2d 1190, 1193 (Fla. 1995). (emphasis in original)

To survive a motion to dismiss a complaint for declaratory relief must show: 1) a bona fide, actual, present practical need for the declaration; 2) a present, ascertained or ascertainable state of facts; 3) that some immunity, power, privilege or right of the complaining party is dependent upon the facts or law applicable to the facts; 4) an actual, present, adverse, and antagonistic interest in the subject matter; 5) that the antagonistic and adverse interests are all before the court; and 6) that the relief sought is not merely giving of an advisory opinion. *People's Trust Ins. Co. v. Franco*, 305 So.3d 579, 583 (Fla. 3rd DCA 2020); *Coal. For Adequacy & Fairness in Sch. Funding, Inc. v. Chiles*, 680 So.2d 400, 404, (Fla. 1996). *See also, Golfrock, LLC v. Lee Cty.,* 247 So.3d 37, 40 (Fla. 2nd DCA 2018) (Although the scope of a court's jurisdiction to issue a declaratory judgment is broad, "it does have limits – one of which is that courts will not render advisory opinions or give legal advice.")

SST's claim for declaratory relief is predicated upon the hopelessly flawed theory that if the submerged land at issue is sovereign, the United States will no longer have the easement for construction and maintenance of the ICW it obtained in the 1935 condemnation judgment.[1] (DE 1, Ex. 3, p. 18, ¶¶ 23, 24). Indeed, the alleged loss of the United States' easement is the sole basis for SST's claim that the United States and FIND are indispensable parties. (DE 1, Ex. 3, p. 18, ¶¶ 24-27). SST's theory seems to be that the sole bases for the federal easement for construction and maintenance of the ICW are the 1935 federal condemnation judgment (DE 1, Ex. 3, pp. 15-16, ¶¶ 5- 13) and the 1942 easement granted by the Trustees to the United States (DE 1, Ex. 3, p. 16-17, ¶¶ 15, 16).

However, SST's theory fails to account for acts of the Florida legislature which granted the United States all necessary rights to construct and maintain the ICW over state lands and waterways in perpetuity. Among these legislative acts is Chapter 4426, Laws of Florida (1895), which provided that:

> SECTION1. That hereafter any railroad or canal company, which is a public carrier, or intended to be, in the construction of its railroad or canal, or in the extension of same, for the purpose of securing terminal facilities therefor on any of the waters of any river, lake, bay, gulf or ocean, shall have and they are hereby given the right to condemn for the use of such railroad or canal company…such area in and over the waters

---

[1] *United States of America v. Parcel 8 Sheet*, case no. 793-m, in the United States District Court for the Southern District of Florida.

> to the limit of the channel, natural or artificial, of such
> rivers, lakes, bays, gulf or oceans sufficient for ample
> room for docks, wharves, elevation, berths for ships,
> ware and store houses, tracks, switches, and all
> required facilities for the reception, retention transfer
> and forwarding of commerce.
>
> SEC. 2. That whenever such land or water privileges
> shall belong to the State of Florida, the use thereof for
> the aforesaid purposes shall vest in said railroad or
> canal company upon the occupancy of both or either
> the said land or water by such company, for such
> purposes…

This statute granted to the Florida East Coast Canal Company all rights over state lands and waters necessary to construct and operate the Florida East Coast Canal, the predecessor to the ICW. A copy of chapter 4426, Laws of Florida (1895) is attached hereto as Exhibit A.

In 1929, the Florida Legislature passed chapter 13664, Laws of Florida (1929), which established:

> An Act empowering and directing the Trustees of the
> Internal Improvement Fund of the State of Florida to
> grant and transfer to the United States of America, a
> right-of-way through the submerged, semi-submerged
> and marsh lands, islands and/or uplands to be
> traversed by an inland waterway following the coastal
> route from Jacksonville, Florida to Miami, Florida, to
> be constructed by the United States, pursuant to Act
> of Congress duly approved by the President of the
> United States on January 21st, 1927…

A copy of chapter 13664, Laws of Florida (1929) is attached hereto as Exhibit B.

14

On October 29, 1929, the Florida East Coast Canal Company deeded "all the right, title, interest, claim and demand" in the land over which the ICW would traverse from Duval County "through the head waters of Bay Biscayne" to the United States. This deed conveyed all rights over Florida's lands and waters previously conveyed by the State of Florida to the Florida East Coast Canal Company for construction of a canal from Jacksonville to Miami to the United States for construction of the ICW. A copy of the October 29, 1929 deed from the Florida East Coast Canal Company to the United States is attached hereto as Exhibit C.

Further, pursuant to chapter 13664, Laws of Florida (1929), on July 18, 1932 the Trustees granted to the United States "the perpetual right and easement to enter upon, excavate, cut away, and remove any or all of the hereinbefore described tracts of land as may be required at any time for the construction and maintenance of said Intra-coastal Waterway…" (emphasis added). The July 18, 1932 deed is attached hereto as Exhibit D.

Florida law therefore makes clear that State of Florida and the Florida East Coast Canal Company granted to the United States all interest in state lands needed to construct and maintain the ICW in perpetuity. As a result, when the United State filed the condemnation action which resulted in the 1935 federal judgment the U.S. needed only to obtain an easement over property which may have been privately owned. There was simply no need to

15

name Florida as a party.

The suggestion that the easement held by the United States for maintenance of the ICW will suddenly become inoperable if the submerged lands at issue are determined to be sovereign is therefore preposterous. Consequently, SST's claim for a declaratory judgment cannot suggest even the "possibility of legal injury on the basis of a hypothetical state of facts which have not arisen and are only contingent, uncertain, [and] rest in the future." *Apthorp v. Detzner*, 162 So.3d at 240. SST cannot show a bona fide, actual, present practical need for the requested declaration, and consequently it has failed to set forth a clam for relief as required by Federal Rule of Civil Procedure 8(a). Count I of SST's counterclaim against the Trustees fails to state a claim upon which relief can be granted and must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

## B. The United States has full authority to maintain the ICW pursuant to the Commerce Clause of the United States Constitution.

"It has long been settled that Congress has extensive authority over this Nation's waters under the Commerce Clause. Early in our history this Court held that the power to regulate commerce necessarily includes power over navigation." *Kaiser Aetna v. United States*, 444 U.S. 164, 173 (1979). As SST acknowledges, in the River and Harbor Act of 1927 Congress authorized construction of the ICW to provide inland navigation along the east coast of

16

the United States. (Doc. 1, Ex. 3, p. 14 ¶ 1). As the Supreme Court explained

in *Gilman v. Philadelphia,* 3 Wall. 713, 724-25, 18 L.Ed. 96 (1866):

> Commerce includes navigation. The power to regulate
> commerce comprehends the control for that purpose,
> and to the extent necessary, of all the navigable waters
> of the United States which are accessible from a State
> other than those in which they lie. For this purpose
> they are the public property of the nation, and subject
> to all the requisite legislation by Congress.

The nature and extent of Congress's pervasive authority over national

waters such as the ICW was set forth by the Supreme Court in *United States*

*v. Appalachian Power Co.,* 311 U.S. 377, 426-27 (1940):

> [I]t cannot properly be said that the constitutional
> power of the United States over its waters is limited to
> control for navigation… In truth the authority of the
> United States is the regulation of commerce on its
> waters. Navigability…is but a part of this whole. Flood
> protection, watershed development, recovery of the
> cost of improvements through utilization of power are
> likewise parts of commerce control… [The] authority
> is as broad as the needs of commerce… The point is
> that navigable waters are subject to national planning
> and control in the broad regulation of commerce
> granted the Federal Government.

Nor does the authority of the United States over national waters depend on

the navigability of a given waterbody. "*Appalachian Power Co.* indicates that

the congressional authority over the waters of this Nation does not depend on

a stream's 'navigability.'" *Kaiser Aetna*, 444 U.S. at 173-74.

17

The ICW is an interstate body of water which the United States has authority to regulate and maintain for the purpose of navigation and commerce pursuant to the Commerce Clause of the United States Constitution. Florida's right to use and control its sovereign submerged lands is subservient to the federal government's authority to regulate navigation and commerce over national waters. Seen in this light, SST's argument that the United States' easement will become null and void if the disputed submerged lands are found to be sovereign is specious.

### C. Count I of SST's Counterclaim Requesting Declaratory Relief Must be Dismissed as a Shotgun Pleading.

The Eleventh Circuit has identified four general types of shotgun pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Office,* 792 F.3d 1313, 1323 (11th Cir. 2015). A complaint which asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against," is one of the four recognized types of shotgun pleadings. *Id.* Another recognized type of shotgun pleading is a complaint that "commits the sin of not separating into a different count each cause of action or claim for relief." *Id.* at 1322-23. "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon

which each claim rests." *Id.; see also, Lampkin-Asam v. Volusia Cnty. Sch. Bd.*, 261 F.App'x 274, 277 (11th Cir. 2008) ("A complaint that fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading constitutes a 'shotgun pleading.'")

When confronting a shotgun pleading, a Court should dismiss the complaint and instruct the plaintiff to file a more definite statement. *See Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 984 (11th Cir. 2008), abrogated on other grounds by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Eleventh Circuit has condemned shotgun pleadings for "imped[ing] the administration of the district Court's civil dockets." *PVC Windoors, Inc. v. Babbitbay Beach Constr., N.V.*, 598 F.3d 806 n.4 (11th Cir. 2010). The Eleventh Circuit has therefore repeatedly held that shotgun pleadings are an unacceptable manner of setting forth a claim for relief and are subject to dismissal.

Count I of SST's counterclaim asks this Court to issue five separate declarations on topics as varied as prohibiting the Trustees from claiming the disputed property as sovereign, that the permits issued by non-party DEP to Globenet and Caribbean are void, and that the consent to use easement issued by the United States is void. In addition, Count I seeks declaratory judgments against the Trustees, the United States, and FIND without differentiating which of the five declarations are sought against which. It is therefore impossible for the Trustees to frame a responsive pleading to Count I as it

constitutes a shotgun pleading. Count I of SST's counterclaim should therefore be dismissed as a shotgun pleading as well.

### III.   Count II of SST's Crossclaim Against the Trustees Fails to Set Forth a Claim for Slander of Title.

SST alleges that the Trustees have slandered its claimed title to the disputed submerged lands "[b]y issuing the Florida QC Easements, publishing those documents to third parties (via the DEP), failing to correct the false statements in those documents, and by refusing to acknowledge that it sold the Property to SST's predecessors in title." (DE 1, Ex. 3, p.23 ¶ 61). Count II of SST's crossclaim alleges that the Trustees slandered SST's title by issuing certain easements. *See* Doc. I, Ex. 3, p. 22, ¶ 51. SST's crossclaim further alleges that it acquired its interest in the submerged property in question on December 9, 2016 and March 29, 2017, at least 16 years *after* issuance of the Trustees' easements to Globenet and Caribbean. (DE 1, Ex. 1 ¶¶ 42, Ex's B, C). Notably, SST does not allege that it was unaware of the conduits, cables, or the Trustees' easements when it acquired its claimed interest.

Remarkably, SST is therefore alleging that the Trustees slandered its title 16 years *before* SST acquired that title. In reality, SST acquired its claim of title to the submerged lands with full knowledge that Globenet's subterranean conduits and Caribbean's cables had been installed under those lands pursuant to easements issued by the Trustees. SST either chose to

acquire its claim to the submerged lands in spite of the presence of the conduits and cables, or more likely *because* of the presence of the conduits and cables. Either way, SST cannot now be heard to complain that the Trustees slandered its claimed title when it acquired its interest knowing full well of the permits and previously installed conduits and cables. Nor has SST explained how it has standing to claim that the Trustees allegedly slandered the title of its predecessors. For these reasons alone, Count II of SST's counterclaim alleging slander of title against the Trustees must be dismissed.

Furthermore, the statute of limitations for slander of title expired before Plaintiff brought its claim. Claims for slander or disparagement of title are subject to the two-year statute of limitations set forth in chapter 95.11(4)(g), Florida Statutes. *See Old Plantation Corp. v. Maule Indus. Inc.*, 68 So.2d 180, 182 (Fla. 1953); *Carey v. Beyer*, 75 So.2d 217, 217 (Fla. 1954). The statute of limitations for slander of title "accrues from the time of publication." *Old Plantation Corp.,* 68 So.2d at 182. The easements referenced in Count II of SST's counterclaim (Doc. 1, Ex. 3, ¶ 51) were issued by the Trustees to Globenet's predecessors were recorded in the public records of Palm Beach County on September 28, 2000 and October 27, 2003. Those easements are attached hereto as Exhibits E and F. If the two-year statute of limitations expired two years after publication, it would have expired on October 27, 2005.

SST claims to have acquired its interests in the subject property on December 9, 2016 and March 29, 2017. *See* Exhibits B and C attached to SST's Amended Complaint, Doc. 1, Ex. 1. Even assuming that the Trustees could have somehow prospectively slandered SST's claimed title, the two-year statute of limitations would have started to run at the latest on March 29, 2017 and would have expired on March 29, 2019. Because SST did not bring its crossclaims against the Trustees until March 18, 2021, the statute of limitations has expired and SST's claim for slander of title must be dismissed.

Further, in order to prevail in its slander of title claim SST must rely on the strength of its own title, not the claimed weakness of the Trustees' title. *See Campbell v. Fields*, 229 F.2d 197, 202 (5th Cir. 1956) (a party claiming slander of title "must make out his case on the strength of his own title, and not on the weakness of his adversary's."); *Bliss v. Commissioner of Internal Revenue*, 57 F.2d 984, 986 (5th Cir. 1932).

As discussed in section I above, Florida's sovereign submerged lands are held in trust for its residents and cannot be conveyed absent express intent and authority. The 1866 deed from the Trustees to Arthur T. Williams did not contain an express, intentional conveyance of sovereign lands. Nor did the Trustees have express authority to convey sovereign submerged lands in 1886.

Because SST cannot show that it held color of title to the disputed property at the time of the Trustees' alleged slanderous acts, because the two-

22

year statute of limitations has expired, and because it cannot demonstrate the strength of its own title, Count II must be dismissed.

## CONCLUSION

For the reasons set forth above, SST's counterclaims against the Trustees must be dismissed.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

*/s/ Timothy L. Newhall*
TIMOTHY L. NEWHALL
Florida Bar No.: 391255
Special Counsel, Complex Litigation Section
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Facsimile: (850) 414-9650
Timothy.Newhall@myfloridalegal.com
Complexlitigation.eservice@myfloridalegal.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of May 2021 I electronically filed a true and correct copy of the foregoing Notice of Appearance with the Clerk of Court using the CM/ECF system.

*/s/ Timothy L. Newhall*
Timothy L. Newhall